EX PARTE JUAN ORONA ACEVEDO, Petitioner, *v.* CARMEN ACEVEDO, Opponent and Appellant.

No. 12900. Decided March 25, 1963.

*José Alberty Orona* for appellant. *José M. Cruz Vargas* for appellee.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

On April 13, 1960 the Aguadilla Part of the Superior Court entered an order adjudging Mario Orona Cruz, the son of Santiago Orona Acevedo, his sole and universal intestate heir. The court determined that Santiago Orona Acevedo died intestate on May 11, 1959. According to the evidence which it had under consideration, Mario Orona Cruz was born on April 26, 1947, out of wedlock, and was acknowledge by his parents.

On May 13, 1960 Carmen Acevedo widow of Orona appeared before the Aguadilla Part and alleged that, according to the law existing in 1947, when Mario Orona Cruz was born—she admitted that he was the acknowledged natural child of her son Santiago Orona Acevedo—in the event there were legitimate ascendants, the acknowledged natural descendants would only be entitled to one half of the hereditary estate, the other half corresponding to the ascendant,

in this case, she. Carmen Acevedo moved the court to amend its order adjudging her also to be intestate heir of her legitimate son Santiago Orona Acevedo, entitled to one half of the property left by him.

The parties having been heard, on March 24, 1961 the trial court rendered judgment, based on findings of fact and conclusions of law, dismissing the petition by Carmen Acevedo and leaving in full force the order originally entered. A motion for reconsideration was denied and Carmen Acevedo has appeared before this Court assailing such judgment.

Before considering at length the problem raised, we will make a brief exposition of the right to the inheritance in the decade from 1942 to 1952 and at the time of the death in 1959.

— I —

Section 736 of the Civil Code (1930 ed.) provided, until it was amended by Act No. 447, approved May 14, 1947 (Sess. Laws, p. 944), effective 90 days after its approval, that forced heirs were, with respect to the legal portion or part of the property which the testator could not dispose of because the law has reserved it for specified heirs, (1) the legitimate children and descendants with regard to their legitimate parents and ascendants; (2) *in the absence* of the foregoing, the legitimate parents and ascendants with regard to their legitimate children and descendants; (3) the widower or widow and the natural children legally acknowledged, and the father or mother of the latter, in the manner and extent established in sections . . . 767, 768 . . . of the Code. The amendment introduced by Act No. 447 *supra* provided that forced heirs are (1) the legitimate children and descendants, with regard to their legitimate parents and ascendants, and *legally recognized natural children, with regard to their natural or legitimate parents and ascendants;* (2) *in the absence* of the foregoing, the legitimate parents and ascendants, with regard to their legitimate children and

descendants; (3) the widower or widow, in the manner and extent established in sections . . . of the Code.

As a result of such amendatory legislation, this Court held in *Travieso* v. *Del Toro*, 74 P.R.R. 940, 942—ratifying the doctrine announced in *Sánchez* v. *District Court*, 69 P.R.R. 457—that if a *will* was executed, the legitimate parent in Travieso was not a forced heir, and that his hereditary rights as such were excluded by the existence of a natural daughter, under § 736 of the Civil Code, as amended by Act No. 447 of 1947.

Regarding the rights of illegitimate children, § 767 provided that when the testator leaves legitimate children or descendants and legally acknowledged natural children, each of the latter shall have the right to a portion equal to one half of the quota pertaining to each of the legitimate children who have not received any advantage or extra portion, provided it could be included in the third which may be freely disposed of. And the following § 768, that should the testator not leave any legitimate children or descendants, but does leave legitimate *ascendants*, the acknowledged natural children shall have a right to one half of the part of the estate which can be freely disposed of. Section 767 *supra*, as amended by Acts No. 13 of March 29, 1945 (Sess. Laws, p. 38) and No. 255 of May 10, 1949 (Sess. Laws, p. 780), provides that when the testator leaves legitimate children or descendants and natural children legally acknowledged, each of the latter shall have a right to a portion equal to that pertaining to each of the legitimate children who have not received any advantage or extra portion. Section 768 in the portion cited, as amended by Act No. 13 of 1945, reserved to the acknowledged natural child, concurring with legitimate ascendants, one half of the estate.

These are so far some provisions bearing on *testate* succession. As to the *intestate* succession, § 893 of the Civil Code provides that succession pertains, *in the first place*, to the descending direct line; and § 884, that in inheritance

the relative nearest in degree *excludes* the most remote, excepting the right of representation in proper cases. Under the title "Acknowledged illegitimate children" in the intestate succession, § 902 provided, before it was amended by Acts No. 448 of May 14, 1947 (Sess. Laws, p. 946) and No. 253 of May 9, 1950 (Sess. Laws, p. 666), that should there be any legitimate descendants or ascendants, the recognized natural descendants shall receive only that portion of the inheritance allowed to them by § § 767 and 768 *supra*, before and after they were amended.

Subsequent to those amendatory laws, § 902 provides in its pertinent part that "Should there be legitimate ascendants, the recognized natural descendants shall receive only the portion of the inheritance granted to them in § 768 of this Code." We know that the portion provided by § 768 is one half of the hereditary estate.

— II —

The foregoing is the positive law pertaining to this case as it stood on August 20, 1952, at the time of the enactment of Act No. 17 providing:

"To Establish the Equality of Rights of Children.
" . . . . . . . .
"Section 1.—All children have, with respect to their parents and to the estate left by the latter, the same rights that correspond to legitimate children.
"Section 2.—The provisions of this Act shall have retroactive effect to July 25, 1952."

■ The predecessor in this case died on May 11, 1959, subsequent to the effectiveness of the former Act No. 17. It is a cardinal principle in our civil law that hereditary rights are determined in the light of the legislation in force at the time of the death. *Berdecía* v. *Superior Court, ante,* p. 100, and cases therein cited; *Heirs of Rosario* v. *Rosario,* 85 P.R.R. 127 (1962); *Ex parte Cortés,* 86 P.R.R. 111 (1962); *Ex parte Vélez,* 81 P.R.R. 634, 646; *Ab Intestato*

of *Ana Garroti Padilla*, 79 P.R.R. 180; *Cancel* v. *Martínez*, 74 P.R.R. 100; *Travieso* v. *Del Toro*, *supra;* *Febre et al.* v. *Febre*, 40 P.R.R. 208; *Gijón* v. *Surillo et al.*, 31 P.R.R. 191; *Torres et al.* v. *Rubianes et al.*, 20 P.R.R. 316; *Correa et al.* v. *Correa et al.*, 18 P.R.R. 115. Not only by reason of the legal technicalities, since no matter how many possibilities and expectations an individual may have to inherit, his right does not take shape or become a reality until the very moment death takes place; but also, and what is still more important, if it is borne in mind that in the right to succeed there are involved basic considerations of public policy of the State, a public policy which may have to be altered in the light of the several economic and social states in the course of the different times. To bind the right to succeed to the existing law at the time of a person's birth would be tantamount to limiting the powers of the State as to its function of determining its public policy in the course of a prolonged period of time such as may be that of the natural life.

■ When Mario Orona Cruz came to the inheritance in 1959, the existing law provided that he would have, with respect to his father and to the property left by the latter, the same rights corresponding to the "legitimate" children. Had he been a "legitimate" child according to the preceding legislation, that is, if he had been born in wedlock, he would have inherited the entire estate under the provisions of § § 884 and 893 *supra*, and under § 898: *"In default* of lawful or acknowledged illegitimate *issue* and their issue, *ancestors* shall inherit from the decedent to the exclusion of collaterals." Since his status was that of acknowledged natural child, the child in this case was entitled to inherit according to § 902 *supra*, namely, one half. However, by virtue and by reason of Act No. 17 of August 20, 1952, his right as a child is the same as that of a "legitimate" child.

Appellant raised before the trial court and raises before this Court the relation existing between Act No. 17 of August 20, 1952, § 2 of which makes it retroactive to July 25,

1952 when the Constitution of the Commonwealth was adopted, and the declaration contained in § 1 of Art. II of the Constitution to the effect that all men are equal before the law; that no discrimination shall be made on account of . . . birth, social origin or condition . . . and that both *laws* and the system of public education shall embody these principles of essential human equality. In view of this relation which unquestionably exists historically as well as spiritually between those provisions, appellant maintains that Act No. 17 does not cover this child because he was born prior to July 25, 1952. Fundamentally, the problem concerns the meaning and effect of § 2 of Act No. 17 *supra*, which is its effectiveness clause, in the light of the right consecrated by § 1. This has prompted us to make a search of the legislative history of this statute in order to determine its true intention and purpose.

To the special session of the Legislative Assembly which commenced July 28, 1952, the Governor sent a proclamation dated July 31, submitting the matters to be considered, among them, "Legislation implementing Section 1 of Article II of the Constitution of the Commonwealth of Puerto Rico, eliminating discrimination by reason of birth." The matter became Senate Bill No. 18, which was reported favorably to the Senate by the Juridical Civil Committee, and was drafted in the manner provided in Act No. 17.[1] It was approved by the Senate and passed to the House. Upon being informed by the Secretary, the Vice-President, Hon. Benjamín Ortiz, stated the following:[2]

"The problem we had encountered as to this legislation referred to the following: Under the Constitution, as you well know, all discrimination is eliminated by reason of birth; that is, that all children are equal in their rights of inheritance and their legal and social position. Natural, adulterous, legitimate children are all in the same position, with respect to the rights

---

[1] 1 Journal of Proceedings, Special Session 1952, pp. 33, 36.

[2] Journal of Proceedings, *id.*, p. 48.

of inheritance. There was a controversy to the effect of whether this legislation should be applied to children who *were born after the Constitution*, while others alleged that it should also be applied to those who had been *born prior* thereto, that is, to all children who were *living* at present.

"This Senate Bill covers all the children. Those *born before* and *those born after*. So that those who favor that theory, among them myself, favor that it should be applied to all children. Even though they *were born prior* to the Constitution, for it is the intention of the Bill to include even those who *were born before*.

"Mr. Santaliz Capestany: Then, all the children are covered?

"Mr. Ortiz: They are all covered. *And let it be recorded that that is the intention of the House in approving this Bill, that the legislation be applied to all the children who were born prior to the Constitution or after the Constitution. It shall cover all children who are now alive.* It follows: 'The provisions of this Act have retroactive effect to July 25, 1952.' Since the Constitution went into effect July 25, the legislation is effective simultaneously with the Constitution.

"Mr. Román García: But could this be construed as if it were effective on July 25, 1952?

"Mr. Ortiz: No. What it means is that those children who on July 25 *were born* have the same rights. Those who *were born* by July 25 and those who were born thereafter.

"Mr. Román García: I don't see that clearly.

"Mr. Figueroa Carreras: Let us examine that carefully, because that is not clear.

"Mr. Ortiz: What is the objection then to this wording?

"Mr. Valentín Vizcarrondo: Mr. Speaker...

"Mr. Santaliz Capestany: Mr. Speaker, an amendment.

"Mr. Valentín Vizcarrondo: I don't know if I am confused, but it seems to me that the new section 1 does not say the same as section 1 of the bill.

"Mr. Ortiz: No, it is an amendment by the Senate.

"Mr. Valentín Vizcarrondo: I know it, but it seems that we ought to accept the amendment improving the former text, not to take away rights from Puerto Rican citizens. And it seems to me that the new text restricts rights...

"Mr. Ortiz: It restricts more, does the colleague think so?

"Mr. Valentín Vizcarrondo: Because here it says 'as of the effectiveness of this Act . . .'

"Mr. Ortiz: Will you allow me? I ask if the intention of the colleague is that it be clearly stated that it applies to all children born prior and after.

"Mr. Valentín Vizcarrondo: Yes, of course.

"Mr. Ortiz: Very well. I propose that it be referred to the Judicial Civil Committee for clarification of the text.

"Mr. Valentín Vizcarrondo: Very well.

"Mr. Santaliz Capestany: It is not necessary to refer it to the Committee. For an amendment, Mr. Speaker. Mr. Speaker, in order not to refer the bill to the Committee, I propose the following amendment: that it state that it shall be retroactive to all children born prior to July 25, 1952. Retroactive to all children born.

"Mr. Ortiz: That that amendment...

"Mr. Santaliz Capestany: Retroactive. It is understood that if it is made retroactive to all children born prior to July 25, 1952, it covers all those born subsequent to that date.

"Mr. Ortiz: Mr. Speaker, that that amendment be referred to the Committee for the corresponding wording.

"Mr. Speaker: To the Committee." (Italics ours.)

At the session on the following day, August 6, 1952, Bill 18 was again brought to the floor and the following proceedings took place in which the Chairman of the Juridical Civil Committee, Hon. Arcilio Alvarado, amply informed: [3]

"Mr. Santaliz Capestany: In view of the importance of this bill and the social implications thereof, I wish the Chairman of the Committee would clearly explain to the House whether in Article 2, when it says that the provisions of this law shall be retroactive to July 25, whether it covers all the children, all the legitimate and natural children in equal rights with the legitimate children, in the case that their parents die after July 25.

"Mr. Alvarado: The answer to that question is yes, definitively. Yes. I wish to make an explanation although....

"Mr. Santaliz Capestany: (Interrupting). Another question if my colleague permits me. I have two questions. The other question is the following: Then, in cases of natural children or of illegitimate children in which their parents have died and the cases have been decided, are the inheritance suits filed in the courts of Puerto Rico pursuant to the laws prior to the

---

[3] Journal of Proceedings, *id.*, pp. 61-66.

approval and to the adoption of the Constitution by the People of Puerto Rico, covered by this law?

"Mr. Alvarado: Those cases in which the predecessor, that is, the one who transfers the inheritance, dies or has died prior to July 25, are not covered by this Act. That is, the situation is the following: The Constitution provides that all children shall be equal before the law; and that Constitution went into effect on July 25. Prior to July 25 all children were not equal before the law. They were classified into legitimate and illegitimate children, in adulterous children and they had different rights according to the different classification of their status as children. That ceased on July 25. From and after July 25, by constitutional provision, all children are equal before the law.

"You know that we began to deal with this problem not in this Special Session but in the prior Special Session when we were approving Acts necessary to implement changes produced by the Constitution. At that time there was a fundamental discrepancy between the Senate and the House; a discrepancy which did not transpire to the public because it was discussed rather in private by the Senate and House members. But the Senate approved the bill by virtue of which the equality between the children provided by the Constitution was *only granted to children born after the effectiveness of the Constitution.* The House did not agree with this view, not officially; unofficially, and after exchanging views among several of the House members we did not agree with that view. We then believed that the bill should grant equality to all the children after the effectiveness of the Constitution, *regardless of whether they were already born and living* and of whatever age they were, even if they were sixty years old, but from the moment that equality is established, that is, from July 25, from then on equality should be maintained for all children alike.

"We could not reach an agreement with the Senate in this unofficial manner and then what we did here was that when the bill came approved by the Senate we sent it to the Committee and it was not considered.[4]

"    .        .        .        .        .        .        .        .

---

[4] Committee Chairman Alvarado referred here—further on Polanco Abréu makes the same reference—to Senate Bill 12 introduced at a previous Special Session which commenced on July 14, 1952, which provided in § 2 as follows: "As respects hereditary rights, the provisions

"You know that the rights of inheritance are transferred at the death of the predecessor, at the death of the person who possesses the property and has the children—the deceased.

"According to the bill that we are approving, the children of any person who dies on July 25 or thereafter, shall be considered equal in the distribution of the property, with equal rights, equal to a legitimate child, regardless of whether they had the condition of illegitimate prior to that date. And equality is produced among the children from July 25 and thereafter.

"Now, the bill does not go into the cases *of death of the predecessors prior to July 25,* and the situation will be that when the predecessor dies prior to July 25 the matter will be governed by the Act which prevailed at the time of the predecessor's death.

"We believe that this should be so, that it is fair and reasonable that it be so. In the first place, there is retroactivity from today to July 25, which is the date when the constitutional change takes place; but we do not interfere with those inheritances which have already been transferred prior to July 25. If at the death of the predecessor prior to July 25 there was any difference between the children we must respect that difference; first, because not to do this would be to give retroactive effect to this Constitution, perhaps meddle with inheritances already adjudicated, give rise to innumerable suits, uproot perhaps a number of questions that have already been adjudicated and decided, which is dangerous.

"Mr. Valentín Vizcarrondo: Will the colleague allow me to ask a question?

"Mr. Alvarado: Yes.

"Mr. Valentín Vizcarrondo: Does the colleague have at hand the Constitution so that you may read what it says?

"Mr. Alvarado: I do not have it at hand, but I remember what it says. What it says is that no discrimination shall be made on account of birth.

"Mr. Valentín Vizcarrondo: Doesn't it provide a term?

of the preceding section shall not apply to the *births occurring prior* to the effectiveness of the Constitution of the Commonwealth of Puerto Rico."

The House of Representatives was never agreeable that the equal protection of the children be granted only to those born subsequent to the Constitution, and the Session adjourned without Bill 12 having been passed by the Legislature.

"Mr. Alvarado: No, that no discrimination shall be made on account of birth. That no discrimination shall be made on account of birth.

"Mr. Valentín Vizcarrondo: But, doesn't it provide any term?

"Mr. Alvarado: Yes. And there would be no discrimination by reason of birth under the Constitution. Under the Constitution. Now, prior to the Constitution there were discriminations by reason of birth.

"Mr. Valentín Vizcarrondo: Did the Constitution put an end to that?

"Mr. Alvarado: It did, from the moment it went into effect; but an adjudication of an inheritance made ten years ago, twenty years ago, a day prior to the effectiveness of the Constitution, was not done under the Constitution. It was done under an Act which provided that there were differences—disagreeable, bad, contrary to our way of thinking, but they existed and they should be respected by us. Now, any transfer of inheritance....

"Mr. Valentín Vizcarrondo: Why respected, if the Judiciary....?

"Mr. Alvarado: No, my colleague, this is something different. They are adjudicated rights under the authority of a former law. In many cases the property has been delivered, in many cases the property has been disposed of by the heirs. If we are to go back, how many years back shall we go? Five, ten, twenty, fifty, a hundred?

"Mr. Valentín Vizcarrondo: It does not matter. The Constitution simply says that all children shall be equal.

"Mr. Alvarado: No, but that would mean that we would bring to the courts hundreds of suits already adjudicated by virtue of existing laws, which actually granted that right. And it seems to us that we should not unnecessarily provoke a chaos in this matter when we can easily establish the border line from the moment the acknowledgment of that equality is made and we should not go back to when the acknowledgment of that absolute equality did not exist.

"Mr. Valentín Vizcarrondo: Then, the colleague thinks it is a chaos for a child to claim what belongs to him?

"Mr. Alvarado: No. I do not think it is a chaos. I think it would be a chaos for a child who has been adjudicated and delivered, under a law which gave him that, property of which

he disposed, that we go back and take that property away from him after he has already disposed of it, and to bring about a truly undesirable and chaotic situation.

"Mr. Valentín Vizcarrondo: Or give him more.

"Mr. Alvarado: No. But most of the times it would be to take away from persons to whom it has been given, and that actually is not sensible nor what we ought to do.

"Mr. Santaliz Capestany: A question to colleague Alvarado: And how will the rights of natural children or of illegitimate children be guaranteed by the other laws before the Constitution becomes effective?

"Mr. Alvarado: Always prospectively. They shall always be respected. What is more, there are decisions of the Supreme Court saying that rights acquired under prior legislation must be respected. Action was always taken prospectively, the law as well as the judicial interpretations.

"Mr. Santaliz Capestany: Doesn't the colleague think that the bill under consideration could be held unconstitutional?

"Mr. Speaker: Use the microphone for the benefit of the other colleagues.

"Mr. Santaliz Capestany: Doesn't the colleague think that the bill which we are adopting right now could not resist a court proceeding to declare it unconstitutional? It seems to me that it does not conform to the Constitution. The Constitution says: 'All men are equal before the law. No discrimination shall be made on account of race, color, sex, birth, origin.'

"Mr. Alvarado: But it says that since the day that Constitution took effect. That is good since July 25.

"Mr. Santaliz Capestany: No. No. That is not our interpretation. The Constitution provides that no discrimination shall be made on account of birth.

"Mr. Alvarado: Before July 25. . . .

"Mr. Santaliz Capestany: And if the law which we pass now does not cover *those who were born prior* to July 25, there is discrimination. . . .

"Mr. Alvarado: *It covers them.*

"Mr. Santaliz Capestany: There is discrimination on account of birth.

"Mr. Alvarado: *It covers them,* colleague.

"Mr. Santaliz Capestany: There is discrimination because of the fact that they were not born under the Constitution.

"Mr. Alvarado: Colleague, *it covers them.*

"Mr. Santaliz Capestany: The Constitution makes all citizens equal.

"Mr. Alvarado: Will my colleague allow me to explain? It covers them. *This Act is not for those who are born after the Constitution. No one has said that here.* That is not in the Act. A child born *before* July 25 who is 70 years old, who was born in the past century, but whose father is still alive, *if the father dies after the 25th,* that is, *if the right of inheritance is effective after July 25, that person has the same right as a legitimate child. So that it is not the birth what determines it.*

"Mr. Santaliz Capestany: And what if the father died?

"Mr. Alvarado: What you are aiming at would require us to turn back prior to July 25 to adjudications already made by the courts, to cases already adjudicated, as to who are the heirs under the existing laws which prevailed and were good at that time, and in order to undo everything that has been done, not knowing how many years back, which in my opinion is not sensible.

"Mr. Santaliz Capestany: In that case, colleague Alvarado, the Constitution does not join in discrimination against those persons whose parents died prior to July 25, to the adoption of the Constitution?

"Mr. Alvarado: No, it does not. Nor does it decide the case of those who were slaves prior to the abolition of slavery.

"Mr. Santaliz Capestany: But they are not any more. They had been freed before the Constitution." (Italics ours.)

The debate proceeded with Valentín Vizcarrondo. His position, as well as that of Santaliz, went even farther: that the law of equality should even cover the inheritance rights in deaths occurring *prior* to the Constitution, according to their interpretation of the constitutional declaration. Committee Chairman Alvarado continued to explain:

"Mr. Alvarado: It is corrected as of July 25. However, to go back before July 25 is simply to try to give retroactive effect to the Constitution, to injure rights acquired under prior legislation, and give occasion to a chaos in matter of inheritance in Puerto Rico; hundreds and thousands of suits, no

one knows how far back, and God knows what effect it would have in the country's economy.

"    .    .    .    .    .    .    .    .

"Mr. Díaz Marchand: Then, am I to understand, colleague Arcilio Alvarado, *that no matter the day the person was born, provided his parents are living . . .?* Isn't that it?

"Mr. Alvarado: *Yes.*

"Mr. Díaz Marchand: He has a right?

"Mr. Alvarado: *The same.*

"Mr. Díaz Marchand: *The same as the legitimate child?*

"Mr. Alvarado: *Yes, that's correct.*

"Mr. Díaz Marchand: Now, then, a person, for example, born at any time prior to July 25, notwithstanding the fact he has the same right as the legitimate child, if his father had died and as a result he acquires the inheritance right, he can not assert such right?

"Mr. Alvarado: If the father died prior to July 25; if the father died prior to July 25. Inheritance is transmitted with the death.

"Mr. Díaz Marchand: In other words, what makes the difference is that the father be not yet dead in order that he may have such right?

"Mr. Alvarado: On July 25. That he is not dead on July 25.

"Mr. Díaz Marchand: Exactly.

"Mr. Alvarado: That is to say, the inheritance is transmitted by death. This system of equality as to hereditary property is established by the Constitution and it is effective from July 25 *for all the cases in which the predecessor dies on or after July 25.* When the predecessor dies *prior* to July 25, then the inheritance is governed by the legislation prevailing at the time of his death.

"Mr. Díaz Marchand: In other words, that *there are no differences established* by virtue of the time or the date in which *the heir is born* in this case?

"Mr. Alvarado: *Correct, correct. Exactly.*

"Mr. Díaz Marchand: But that the difference lies in the fact of whether the father who is to leave the inheritance—to the son in this case—would still be alive at this moment.

"Mr. Alvarado: *That's it.* That the right of inheritance be acquired by the Constitution. That the right of inheritance

is acquired by the death of the predecessor. That the predecessor must have died on or after July 25, regardless of *when the child was born."* (Italics ours.)

At this stage Mr. Santiago Polanco Abréu intervened, upholding the position taken by Mr. Alvarado:

"Mr. Polanco Abréu: I think it is my duty to raise my voice in union of my colleague Alvarado at this moment in which we are discussing a legislation which I have been defending from the very moment that I took my seat in this House, presenting bills year after year and that for one reason or another have not been approved.

"     .     .     .     .     .     .     .

"So that this legislation which is under our consideration is, I believe, the wish of almost all of us, of all of us who are seated here in the House of Representatives; but within the realistic concept of the principles of law brilliantly stated by our colleague Alvarado, we have no other alternative than to answer those who ask us whether this refers to partitions, wills, made prior to July 25, that this legislation can never be applied to that. . . .

"Mr. Santaliz Capestany: (Interrupting) Why?

"Mr. Polanco Abréu: Because the vested right already existed, because those children had already acquired certain rights, those very natural children had acquired certain rights under the authority of specific legislation. But it should be noted that we have before us a criterion expressed by the Senate in a bill, and, yet, what was our basic position? That the bill as it originally came phrased *only had the scope of protecting the children who were born after July 25,* when the view we take here and which we have maintained for many years is that it should be applied *to all children born prior to the Act,* provided that the parents *die after* July 25.

"     .     .     .     .     .     .     .

"Mr. Ortiz: Mr. Chairman: A few words to explain or express my opinion on this legal or juridical point of view which has been raised here on this matter.

"In the first place I wish to remind you that the previous controversy in this Legislative Assembly, in the past Special Session, did not refer to this question we are discussing here now but to the fact that some believed that this legislation should be applied only to the children born after the Constitu-

tion, and others wanted it to be applied to all the children born before or after. I favor the second theory, that is, that it be applied to all the *children* born before or after the Constitution in order to establish that equality.

"The Senate Bill applies to the children who are *born after* the Constitution as well as to those who *are born before* but who have not yet acquired vested rights. And here is where the difficulty lies.

"The sense of justice of our colleague Valentín and our colleague Santaliz and of other colleagues, that if this legislation is applicable to those born before, then, why establish a difference that the parents should die after the Constitution and why not apply the same principle to those cases in which the parents have died before? That is, to establish absolute equality, absolute justice. But although I understand the justice of the position assumed we must confront certain constitutional difficulties, because, for example, if the parents have died previously it means that the children who had that parent had acquired certain hereditary rights under the prevailing legislation, that there were partitions, deeds, contracts, that judgments were rendered, litigations decided with all the inherent rights and I assure you it is a legal constitutional principle that a subsequent legislation can not affect the rights previously acquired. And that is a basic and elementary rule.

"     .     .     .     .     .     .

"Mr. Román García: Mr. President and House fellow members: Incidentally when this bill came yesterday before the consideration of the House, because I have serious doubts which lurked in my mind as to the approval of a legislation of this kind, a sort of small tidal wave went up. And this bill passed to the Committee to be studied. This morning my colleague Arcilio Alvarado before entering into session began to explain to me the scope of this legislation. At first I must confess my points of view were the same as those maintained by my colleague Valentín and those maintained by Santaliz.

"Now, we should not shut our minds to the reality. The positive reality is that if *there have been partitions, liquidations of inheritance, judgments in the courts and all those proceedings,* if all of them have been consummated already, it seems to me that a provision such as that originally maintained herein, and which has been maintained by colleagues Valentín and Santaliz, it seems to me that a legislation which entails, as explained

by Mr. Ortiz, the annulment of those liquidations, those partitions of inheritance which have been previously made, would be unconstitutional.

"Mr. Valentín Vizcarrondo: Even though they were unfair, my colleague?

"Mr. Román García: We are not dealing with the question of whether they were unjust. I consider that they are not unjust because they were issued and regulated by statutes and laws which existed at the time that those liquidations were made or that the inheritances were declared.

"Therefore, I wish to confess that the view that has been discussed herein, has been cleared up in the debate of this bill and has completely changed my view which I expressed half an hour ago." (Italics ours.)

At the session of August 8, Bill 18 was approved with all the votes in the affirmative, including those of Mr. Santaliz Capestany and Mr. Valentín Vizcarrondo, and thus it became Act No. 17.

Perhaps there may not be many occasions in which, as here, there is luckily available, as a result of the lengthy debate on the application and effects of certain legislation, a most indubitable legislative expression as that referring to Act No. 17 which establishes the equality of rights of the children in their parents' property. This is one of those occasions in which, because there is involved, not a certain legislation of a technical or merely legalistic type, but a revendicatory social legislation, the legislative expression as to its purposes and effects should be of incalculable value to the courts. But apart from its social content, the legislation, as the lawmaker had it in mind responds faithfully to the well-established principle that it ought to be the existing law at the time of the death, rather than the existing law at the time of birth, which shall govern the right to inherit.

■■ There should not be the least doubt that Act No. 17 does not govern hereditary rights of any child in the event of death occurring prior to its effectiveness, July 25,

1952, in view of the applicable principles of law and the reasons of public policy so clearly expressed by the law-makers. But there should not be the least doubt either that Act No. 17 governs the hereditary rights of a child in any case in which the death occurs *subsequent* to its effectiveness, regardless of whether the child was born *prior* to that date. Although it is true that the Legislative Assembly in adopting Act No. 17 acted on the basis of the constitutional provision to the effect that "the laws . . . shall embody these principles of essential human equality," this situation did not arise with the Constitution, but dates back to the 1942 legislation concerning children. That is why in the Report of the Bill of Rights Committee, the Chairman, Delegate Jaime Benítez, stated, in referring to the birth, that *the existing legislation already covered almost entirely* the recommendations of the report. In other words, the Legislative Assembly did not need, nor depend necessarily, on the authority of the constitutional provision to enact legislation such as Act No. 17.

We could already dispose of this appeal were it not because appellant invokes the decisions of this Court in the cases of *Álvarez* v. *Álvarez*, 77 P.R.R. 862; *Sánchez* v. *Díaz*, 78 P.R.R. 771; *Márquez* v. *Avilés*, 79 P.R.R. 816; and *Ex parte Vélez*, 81 P.R.R. 634.

*Álvarez* v. *Álvarez* does not conflict at all with the principle announced. It will suffice to say, although it does not appear from the face of the opinion but rather from the record, that the predecessor in *Álvarez* died *prior* to July 25, 1952, on January 6, 1951, and not subsequent thereto. It was necessary to apply, as were applied, the laws in force at the time of his death, and according to those laws we held that those children which pursuant to the legislation prior to 1942 were adulterous children could be compulsorily recognized solely for the purpose of bearing their father's surname, without any right to inherit.

In *Sánchez* v. *Díaz* an action of filiation was brought while the father was living and the problem which arose was not one of inheritance but on sufficiency of the evidence to establish the filiation, which we denied. This case does not conflict either with the present decision.

Similarly, the decision in *Ex parte Vélez* does not present any obstacle and is not adverse. In that case the death occurred on January 20, 1952, or *prior* to the proclamation of the Constitution and to the effectiveness of Act No. 17. A property right of hereditary origin was adjudicated in the light of existing legislation at the time of the death.

In *Márquez* v. *Avilés*, also invoked by appellant, the death actually occurred subsequent to Act No. 17, on March 18, 1954, as it appears from the record on appeal and from the conclusion of the trial court. However, *Márquez* v. *Avilés* arose as a problem of filiation of children born prior to the filiation legislation of 1942. We need not make a pronouncement at this time as to that decision made in the light of its own facts. It will suffice to say that in view of the different situation of fact of the case at bar, in which no question of filiation is involved and the child was born subsequent to 1942, *Márquez* v. *Avilés* is no bar either to the present decision.